**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X
JOHN DOE,                                            :
                                                     :      Civil Action No. 1:24-cv-06117
                        Plaintiff,                   :
                                                     :
           v.                                        :      **DEFENDANT INTEL**
                                                     :      **CORPORATION'S ANSWER AND**
                                                     :      **SEPARATE DEFENSES TO**
INTEL CORPORATION,                                   :      **PLAINTIFF'S COMPLAINT**
ALAA BADR and ABDUL JARRAR,                          :
                                                     :
                        Defendants.                  :
---------------------------------------------------------- X

Defendant Intel Corporation ("Intel"), by and through its attorneys, Morgan, Lewis & Bockius LLP, hereby answer the Complaint ("Complaint") of Plaintiff John Doe ("Plaintiff") in the above-captioned matter by admitting, denying or averring as follows.

## INTEL'S PRELIMINARY STATEMENT

Founded in 1968, Intel Corporation ("Defendant," "Intel," or the "Company") is a United States-based company with approximately 100,000 employees in over 50 countries across the world. Intel strongly believes that embracing diversity and inclusion is key to innovation and growth and strives for an inclusive and fully engaged workforce that is reflective of the best and brightest talent in our industry. Intel further maintains a Code of Conduct which provides that the Company does not tolerate harassment or discrimination on the basis of any legally protected characteristic.

Intel is Israel's largest private employer, employing over 11,000 people, including deep engineering talent, and maintaining three development centers with additional projects and investments planned.

Intel reinforced its support for its workforce in Israel in the aftermath of Hamas' October

1

7, 2023 attacks. Intel provided each employee with a $5,000 wartime grant, supported local humanitarian efforts, and continues to offer resources to support its Israeli community around the world. Intel has also provided humanitarian aid through reflief organizations supporting civilians in Gaza as part of the company's deep commitment to the region overall.

Intel has been a global technology leader since it created the microprocessor industry more than 50 years ago. Throughout this time, Intel has continued to innovate and evolve its business to help ensure the company adapts to changing market conditions and customer needs. As such, Intel routinely evaluates opportunities for possible acquisitions, divestitures, and other strategic decisions such as restructuring. Since October 2022, Intel has conducted a series of restructurings as part of a multi-year transformation of the company. Intel is currently implementing a publicly announced plan to review its business portfolio and reduce its costs by more than $10 billion which includes a headcount reduction of approximately 15,000 employees globally. These decisions are made with careful consideration of the company's business needs. By becoming a leaner, simpler and more agile company, Intel will be better positioned to compete in the market, meet the needs of its customers, and deliver long-term sustainable growth.

## PRELIMINARY STATEMENT[1]

1.     Intel Corporation's 2023 revenues were $54.3 billion, and those revenues were driven heavily by the ongoing contributions that Israel, Israelis and Jewish people have made to Intel over the last 50 years, including the hard work and dedication of Intel's 10,000+ Israeli employees.

**ANSWER:** Intel admits that its revenues in 2023 were approximately $54.2 billion, and

---

[1]     For the Court's convenience and ease of reference, Intel uses the same headings found in the Complaint, but does not admit to the substance of any of those headings. To the extent a response is required, Intel denies the substance of those headings.

that it employs over 10,000 employees in Israel. Intel admits that many of its employees, including Israeli and Jewish employees, have made meaningful contributions to Intel's success. Intel denies the remaining allegations in Paragraph 1.

2.    Intel's first employee, Andy Grove ("Grove"), hired in 1968, was a Jewish man who survived Nazi occupation and escaped Communist-controlled Hungary at the age of 20. In 1969, Intel hired Dov Frohman, Ph.D. ("Frohman") - an Israeli-Jewish electrical engineer who lost his parents in the Holocaust and spent several years of his childhood in Jewish orphanages.

**ANSWER:** Intel admits that it hired Andrew Grove ("Grove") immediately following its incorporation in 1968, and that it hired Dov Frohman ("Frohman"), an electrical engineer, in 1969. Upon information and belief, Intel admits the remaining allegations in Paragraph 2.

3.    Intel would never have gotten off the ground, much less become the technology juggernaut that it is today, without the contributions of Grove and Frohman. And, in the 55 years since, Intel has relied significantly on the good graces of the Israeli government and its people to develop products, drive revenues and subsidize its business.

- In 1974, "Intel Israel" was founded in Haifa, Israel. Intel's Haifa employees worked on products critical to Intel's future, including key components of what would become the Pentium microprocessor.

- In 1985, Intel opened a fabrication facility in Jerusalem, Israel, its first such factory outside of the United States.

- In 1996, Intel built a $2.4 billion facility in Kiryat Gat, Israel.

- In 2005, Intel built a second facility in Kiryat Gat. Five years later, in 2010, Intel designed its first green building in Haifa, Israel.

- In 2017, Israel became home to Intel's Autonomous Driving Group, after the company acquired Mobileye, an Israel-based company that specialized in autonomous driving technology

- Two years later, in 2019, Intel unveiled an 800,000 square-foot, 11-story development center in Petah Tikvah, Israel called PTK1.

- In 2021, Intel began building a new manufacturing center in Kiryat Gat, Israel at an estimated cost of $10 billion. At the time, Pat Gelsinger ("Gelsinger"), Intel's Chief Executive Officer ("CEO"), said that Intel's continued investments in the country "promise a vibrant future for Intel and Israel for decades to come."

- In 2023, the aforementioned $10 billion manufacturing center in Kiryat Gat, Israel began operating.

- Also in 2023, Intel announced its largest investment in Israel to date – a $25 billion factory in Kiryat Gat, Israel. Toward the historic effort, the Israeli government agreed to provide Intel with a $3.2 billion grant.

**ANSWER:** Intel admits that Grove and Frohman contributed to Intel's success; that Intel Israel was founded in Haifa, Israel in 1974, as the Company's first development center outside the United States; that it opened its first fabrication facility outside the United States in Jerusalem, Israel, in 1985; that Intel's Haifa employees worked on key components of what later became the Pentium microprocessor; that it built a $2.4 billion facility in Kiryat Gat in 1996 and a second facility in Kiryat Gat in 2005; that it designed its first green building in Haifa in 2010; that it acquired Mobileye in 2017 and established its Autonomous Driving Group in Israel; that it opened an 800,000 square-foot, 11-story development center in Petah Tikvah, Israel in 2019, called PTK; that it began building an approximately $10 billion manufacturing center in Kiryat Gat in 2021, which began operating in 2023; and that it announced a $25 billion factory in Kiryat Gat in 2023, for which the Israeli government is providing a $3.2 billion grant. Intel denies the remaining allegations in Paragraph 3.

4.      As of 2024, Intel employs more than 10,000 employees in Israel and thousands more Israelis and Jewish people across the globe. One of those Israeli employees is John Doe, a former member of the Israel Defense Forces ("IDF") who immigrated to the United States to expand the U.S. presence of an Israeli startup (the "Startup") that improved processor engines.

**ANSWER:** Intel admits that it employs over 10,000 employees in Israel, as well as Israelis and Jewish employees across the globe. Intel further admits that Plaintiff previously worked in the U.S. for a company that was acquired by Intel and that it employs Plaintiff in the U.S. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 and, therefore, denies those allegations.

5.      Shortly after John Doe arrived in New York City, the Startup was bought by Intel. At the time, John Doe was identified as one of the Startup's top 10 most important employees. As a result of his skills and talents, he was given a substantial retention bonus set to be paid out over time. His performance for Intel was outstanding, and he was promoted on multiple occasions, including as recently as January 2024.

**ANSWER:** Intel admits that it acquired the company Plaintiff worked for previously (hereinafter, the "Acquired Company") in 2022 and provided Plaintiff with a retention bonus. Intel denies the remaining allegations in Paragraph 5.

6.      Given Intel's significant reliance on the Israeli people and economy, John Doe was not surprised when the Company purported to stand with Israel after Hamas, a terrorist group, unleashed an assault of startling brutality and breadth upon Israel on October 7, 2023.

**ANSWER:** Intel admits that it provided support to its Israeli employees following the Hamas attack on October 7, 2023.  Intel lacks knowledge or information sufficient to form a belief as to Plaintiff's purported reaction thereof and, therefore, denies those allegations.

7.      Indeed, in supposed support for Israel, in November 2023, Intel provided its Israeli employees a $5,000 wartime grant. In December 2023, Gelsinger stated: "For almost 50 years, we were the first company to start the tech nation there. I was just on the phone, yesterday, with Isaac

Herzog, the president of the country. This is a resilient people. We will support them. We believe so deeply in what they've done."

**ANSWER:** Intel admits that it provided its employees in Israel with a $5,000 wartime grant in November 2023. Intel avers that Paragraph 7 purports to quote a portion of a December 23, 2023, televised interview with Gelsinger, which speaks for itself.

8.      Unfortunately, as it turned out, Gelsinger's words were nothing more than lip service for public relations purposes. Indeed, during the same time period in which Gelsinger was making these comments and Intel was claiming to support Israel, one of Intel's senior executives, Alaa Badr ("Badr") – Intel's Vice President of Customer Success - was openly celebrating Hamas, Qassam Brigade - the military arm of Hamas, the terroristic attacks on Israel and the death of Israeli citizens and soldiers.

**ANSWER:** Intel denies the allegations in Paragraph 8.

9.      Rather than keeping his views to himself, Badr splashed them across social media, retweeting and "liking" a number of anti-Israel and antisemitic postings, including posts cheering on the deaths of Israelis and IDF soldiers.

**ANSWER:** Intel admits that Alaa Badr ("Badr") "liked" certain  posts on X, formerly Twitter, which are the subject of this Complaint. The remaining allegations in Paragraph 9 purport to characterize such posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 9.

10.     Many of these horrific and troubling postings are included herein, including the pictures below:

**ANSWER:** Intel admits that Plaintiff included certain  X posts in his Complaint, including those contained in Paragraph 10. The remaining allegations in Paragraph 10 purport to characterize

such posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 10.

11.     These pictures were obviously deeply offensive and upsetting to John Doe for a variety of reasons, including the fact that one of his close family members is an IDF soldier and, in the wake of the October 7, 2023 invasion, Hamas continued to fire missiles into Israel, one of which struck the home of John Doe's family, resulting in injuries to, and the displacement of his immediate family members.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 and, therefore, denies those allegations.

12.     Badr's offensive postings were known to senior Intel executives by late 2023, but nothing was done. Then on January 29, 2024, John Doe was reassigned to report directly to Badr.

**ANSWER:** Intel admits that Plaintiff was assigned to report directly to Badr on or about February 9, 2024, and that Intel reviewed concerns about the "liked" posts and addressed them with Badr. Intel denies the remaining allegations in Paragraph 12.

13.     It is impossible to overstate how disturbing this was for John Doe. He was reporting to, and forced to interact daily with, an individual whom he knew would celebrate the murder, and even the burning alive, of his immediate family members.

**ANSWER:** Intel admits that Plaintiff began reporting to Badr on or about February 9, 2024.  Intel lacks knowledge or information sufficient to form a belief as to Plaintiff's purported emotions as alleged in Paragraph 13 and, therefore, denies those allegations. Intel denies the remaining allegations in  Paragraph 13.

14.     To make matters worse, Badr was not shy about his antisemitic views even with John Doe himself. For example, Badr repeatedly pressured John Doe to tell him whether other

Intel employees were Israeli. When John Doe confirmed that specific employees were Israeli, Badr sneered that there were "so many Israeli employees in our company."

**ANSWER:** Intel denies the allegations in Paragraph 14.

15.    Upon learning that he would be required to report to Badr, John Doe immediately communicated with the former CEO (the "Former CEO") of the Startup he had previously worked at who was also hired by Intel in connection with the buyout, to express his distress. He told the Former CEO that given Badr's opinions about Israelis and the IDF specifically, he knew Badr would fire him as soon as he could.

**ANSWER:** Upon information and belief, Intel admits that Plaintiff raised concerns regarding certain X posts Badr "liked" with the Former CEO of the Acquired Company (hereinafter, the "Acquired Company CEO"). Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 and, therefore, denies those allegations.

16.    The Former CEO agreed to file an official complaint on behalf of John Doe.

**ANSWER:** Intel admits that the Acquired Company CEO submitted an anonymous complaint related to certain X posts Badr "liked."  Intel denies the remaining allegations in Paragraph 16.

17.    Initially, the Former CEO asked Human Resources department personnel at Intel to file an official complaint against Badr. However, likely fearing retaliation given her own status as an Israeli, she was hesitant to do so. As such, on February 4, 2024 the Former CEO filed the complaint himself through Intel's "EthicsPoint."

**ANSWER:** Intel admits that the Acquired Company CEO submitted a complaint anonymously through Intel's EthicsPoint on February 4, 2024. Intel denies the remaining

allegations in Paragraph 17.

18.    In the complaint, the Former CEO included a compilation of screenshots that showed Badr supporting Hamas and the murder of Israelis and Jews. He specifically stated that he was "report[ing] a concern with regards to an employee being hostile towards Israel and Israelis." In the complaint, the Former CEO also asked that Abdul Jarrar ("Jarrar"), the Vice President of Business Sales and Badr's manager, be notified about the complaint. Finally, it was obvious from the complaint, as well as a follow-up complaint in which the Former CEO shared the fact that John Doe's family had been injured and displaced in connection with a Hamas missile attack, that it was being made on John Doe's behalf.

**ANSWER:** Paragraph 18 purports to characterize an EthicsPoint complaint, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 18.

19.    Incredibly, no remedial action was taken in response to the Former CEO's complaint and John Doe continued to report to a man who would like to see his family murdered. Intel did literally nothing to protect John Doe, which ultimately resulted in his discriminatory and retaliatory termination.

**ANSWER:** Intel denies the allegations in Paragraph 19.

20.    Indeed, shortly after the aforementioned follow-up complaint, in March 2024, Badr viewed John Doe's LinkedIn profile, which identifies John Doe as a former IDF soldier.

**ANSWER:** Paragraph 20 purports to characterize John Doe's LinkedIn profile, which is a written document that speaks for itself. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 and, therefore, denies those allegations.

21.    Just a few weeks later, on April 2, 2024, Jarrar informed John Doe that his employment was being terminated due to a purported need to cut costs. John Doe was the only one of Badr's reports that was terminated (and the only Israeli amongst Badr's direct reports).

**ANSWER:** Intel admits that, on April 2, 2024, Abdul Jarrar ("Jarrar") informed Plaintiff that his position was being eliminated as part of a reorganization that was based, in part, on cost cutting measures. Intel admits that Plaintiff was the only direct report of Badr's to be impacted by the reorganization. Upon information and belief, Intel admits that Plaintiff was the only Israeli that reported directly to Badr at the time of the reorganization.

22.    The unlawful motives behind John Doe's termination could not have been more clear when, just weeks later, Badr and his supervisor, Jarrar, hired John Doe's replacement: Mohamed Ahmed ("Ahmed"). Incredibly, Ahmed openly espoused the same anti-Israel sentiments as Badr.

**ANSWER:** Intel admits that it hired Mohamed Ahmed in May 2024. Intel denies the remaining allegations in Paragraph 22.

23.    Like Badr, Ahmed has liked and reposted heinous terroristic and antisemitic materials, including, among others, the below postings:

**ANSWER:** Paragraph 23 purports to characterize social media posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 23.

24.    Ahmed also openly called for the boycott of companies that supported Israel in the wake of Hamas' invasion.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and, therefore, denies these allegations.

25.     By unlawfully terminating John Doe's employment and blessing Badr's horrific calls for the annihilation of Israelis, Intel turned its back not only on John Doe, but also on Israel, the Israeli people and government, and Jewish persons across the globe.

**ANSWER:** Intel denies the allegations in Paragraph 25.

26.     For these reasons, and all those set forth below, John Doe seeks all available monetary, equitable and/or injunctive relief for Defendants' violations of 42 U.S.C. § 1981 ("Section 1981"); New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"); and the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL").

**ANSWER:** Intel admits that Plaintiff purports to bring this action pursuant to Section 1981, the NYCHRL, and the NYSHRL. Intel denies that it engaged in any unlawful conduct and that Plaintiff is entitled to damages. Intel denies any remaining allegations in Paragraph 26.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

**ANSWER:** The allegations in Paragraph 27 are conclusions of law to which no response is required. To the extent a response is required, Intel admits that Plaintiff purports to invoke the jurisdiction of this Court and denies any remaining allegations in Paragraph 27.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful discrimination and retaliation alleged herein, occurred in this district.

**ANSWER:** The allegations in Paragraph 28 are conclusions of law to which no response

is required. To the extent a response is required, Intel admits that Plaintiff purports to invoke the venue of this Court and denies any remaining allegations in Paragraph 28.

29.    Simultaneously with the filing of this Complaint, Plaintiff will file a Charge with the Equal Employment Opportunity Commission. When Plaintiff receives a Right to Sue, he will seek leave to amend this Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

**ANSWER:** Intel admits that, in or about September 2024, Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), which is a document that speaks for itself; Intel denies Plaintiff's characterization of events in the EEOC Charge.   Intel lacks knowledge or information sufficient to form a belief as to Plaintiff's intended actions upon receipt of a Right to Sue letter from the EEOC and, therefore, Intel denies these allegations.  Intel denies any remaining allegations in Paragraph 29.

## PARTIES

30.    John Doe is a resident of the State of New York. John Doe was and is an "employee" of Defendants under all applicable statutes.

**ANSWER:** The allegations in Paragraph 30 as to whether Plaintiff is a "resident" of New York meets the definition of "employee" under all applicable statutes are conclusions of law to which no response is required and, therefore, Intel denies these allegations.   To the extent a response is required, Intel admits upon information and belief that Plaintiff resides in New York, admits that it employs Plaintiff and denies the remaining allegations in Paragraph 30 of the Complaint.

31.    Intel Corporation is a Delaware corporation that is headquartered in California. Intel was and is an "employer" of John Doe under all applicable statutes.

**ANSWER:** . The allegations in Paragraph 31 as to whether Intel meets the definition of an "employer" under all applicable statutes are conclusions of law to which no response is required and, therefore, Intel denies these allegations. To the extent a response is required, Intel admits that it is incorporated in Delaware and headquartered in California and that it employs Plaintiff.

32.     Alaa Badr is a resident of Washington. Badr was and is an "employer" of John Doe, and/or an "aider" and/or "abettor," under all applicable statutes.

**ANSWER:** The allegations in Paragraph 32 as to whether Badr is a "resident" of Washington or meets the definitions of "employer," "aider," and/or "abbetor" under all applicable statutes are conclusions of law to which no response is required and, therefore, Intel denies these allegations. To the extent a response is required, Intel admits upon information and belief that Badr resides in Washington and denies the remaining allegations in Paragraph 32 of the Complaint.

33.     Abdul Jarrar is a resident of California. Jarrar was and is an "employer" of John Doe, and/or an "aider" and/or "abettor," under all applicable statutes.

**ANSWER:** The allegations in Paragraph 33 as to whether Jarrar is a "resident" of California or meets the definitions of "employer," "aider," and/or "abbetor" under all applicable statutes are conclusions of law to which no response is required and, therefore, Intel denies these allegations. To the extent a response is required, Intel admits upon information and belief that Jarrar resides in California and denies the remaining allegations in Paragraph 33 of the Complaint.

## FACTUAL ALLEGATIONS

## I.    INTEL'S DECADES-LONG RELIANCE ON ISRAEL AND THE ISRAELI PEOPLE

34.     Intel creates world-changing technology that enriches the lives of nearly every person on Earth in some capacity. This multinational technology company is one of the world's

leading manufacturers of central processing units and semiconductors. Indeed, Intel creates the crucial components of almost every electronic device essential to the modern world.

**ANSWER:** Intel admits that it is a multinational technology company that develops and manufactures certain technology, including central processing units, semiconductors, and other components used in electronic devices worldwide.

35.    To say that Intel's trajectory has been upward would be an understatement. Over and over, Intel has been ranked in the Fortune 500 list of the largest United States corporations by revenue. Most recently, its full-year revenue for 2023 was $54.2 billion. Without question, Intel is a juggernaut in the field of cutting-edge technology and has cemented its spot as a world leader.

**ANSWER:** Intel admits that it develops and manufactures certain cutting-edge technology, that it has been ranked in the Fortune 500 list of the largest United States corporations by revenue and that its revenues in 2023 were approximately $54.2 billion, and further avers that these figures do not reflect Intel's current financial status. Intel denies the remaining allegations in Paragraph 35 of the Complaint.

36.    Intel's success, however, was hard-fought by the pioneers who laid the groundwork and put in the hours and propelled it to success – many of whom were Israeli and Jewish.

**ANSWER:** Intel admits that it has employed Israeli and Jewish individuals since its inception and that many of its employees, including Israeli and Jewish employees, have made meaningful contributions to Intel's success.

37.    Intel was founded in 1968 by Robert Noyce and Gordon Moore. However, Noyce and Moore did not build the company alone; they were joined by Grove, a Hungary-born Jewish

man, from the very first day Intel was incorporated. Grove joined Intel as its first Director of Engineering - in fact, he was Intel's first official employee.

**ANSWER:** Intel admits that Robert Noyce and Gordon Moore founded Intel in 1968. Intel also admits that Mr. Grove joined Intel as Director of Engineering shortly after Intel was incorporated as the first employee of Intel. Upon information and belief, Intel admits that Grove was a Hungary-born Jewish man.

38.     Grove's life is well publicized considering its valor and success. Indeed, as a child, Grove survived Nazi occupation and escaped Communist-controlled Hungary at the age of 20.

**ANSWER:** Upon information and belief, Intel admits the allegations in Paragraph 38.

39.     Once in America, he earned his education and became the man who is widely credited for transforming Intel from a memory chip manufacturer into one of the world's top microprocessor producers.

**ANSWER:** Intel admits that Grove played a key role in transforming Intel from a memory chip manufacturer into one of the world's top microprocessor producers. Upon information and belief, Intel admits the remaining allegations in Paragraph 39.

40.     In 1969, Frohman, an Israeli-Jewish electrical engineer, joined Intel. Like Grove, Frohman's success did not come easy. Frohman, having lost his parents in the Holocaust, spent several years of his childhood in Jewish orphanages before he was adopted by relatives in Israel. From that point on, Frohman grew up in Tel Aviv, Israel and proudly served in the Israeli army prior to starting his advanced education.

**ANSWER:** Intel admits it hired Frohman in 1969. Upon information and belief, Intel admits the remaining allegations in Paragaph 40.

41.    Just one year after joining Intel, and two years after the company was founded, Frohman developed the concept for the erasable programmable read-only memory ("EPROM"). The EPROM business remained one of Intel's most profitable products well into the 1980s and laid the groundwork for flash memory.

**ANSWER:** Intel admits the allegations in Paragraph 41.

42.    Then, in 1974, "Intel Israel" was founded in Haifa, Israel, as Intel's first development center outside of the U.S. Intel's Haifa location worked on products critical to Intel's future, including key components of what would become the Pentium microprocessor.

**ANSWER:** Intel admits that Intel Israel was founded in Haifa, Israel in 1974 as the Company's first development center outside the United States. Intel further admits that employees at the Haifa development center worked on products that eventually became components of the Pentium microprocessor. Intel denies the remaining allegations in Paragraph 42.

43.    In 1985, after learning first-hand how lucrative its dealings with Israel were, Intel doubled down on the partnership and opened its first fabrication facility outside of the U.S.A., known as Fab 8. This time, the facility was constructed in Jerusalem, Israel. By the early 1990s, Fab 8 was responsible for about three-quarters of the global output of the 386 microprocessor, at the time Intel's best-selling product.

**ANSWER:** Intel admits that it opened its first fabrication facility outside of the United States in Jerusalem, Israel, known as Fab 8, in 1985. Intel also admits that, by the early 1990s, Fab 8 was responsible for approximately 75% of the global output of the 386 microprocessor, which was the Company's best selling product at the time. Intel denies the remaining allegations in Paragraph 43.

44.     Also in 1985, Frohman, who had a hand in negotiating on behalf of Intel for a plant in Jerusalem, was named the General Manager of Intel Israel. In his role, Frohman managed the Fab 8 through the first Gulf War and kept it running as Scud missiles rained down on Israel.

**ANSWER:** Intel admits that Frohman assisted in negotiating on behalf of Intel for the plant in Jerusalem, was named General Manager of Intel Israel in 1985, and kept the Fab 8 operational during the first Gulf War. Intel denies the remaining allegations in Paragraph 44.

45.     Given that it was making money hand over fist from its partnerships with Israel and the Israeli people, in 1996, Intel built a $2.4 billion facility in Kiryat Gat, Israel. The Israeli government contributed $600 million toward the effort.

**ANSWER:** Intel admits that it built a $2.4 billion fabrication facility in Kiryat Gat, Israel in 1996, and that the Israeli government contributed approximately $600 million toward said project. Intel denies the remaining allegations in Paragraph 45.

46.     In 1997, Grove was named *Time* magazine's Man of the Year. The magazine's treatment of Grove was especially laudatory - it not only portrayed him, Intel and their joint contributions favorably, but also conveyed that the impact of Grove's contributions extended far beyond the calendar year of 1997.

**ANSWER:** Paragraph 46 purports to characterize a *Time* magazine article, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 46.

47.     In 2005, after a nearly decade-long successful run in Kiryat Gat, Israel, Intel announced a $3.5 billion complementary facility in Kiryat Gat, Israel.

**ANSWER:** Intel admits that it announced a $3.5 facility in Kiryat Gat, Israel, in 2005. Intel denies the remaining allegations in Paragraph 47 of the Complaint.

48.    In 2010, Intel designed its first green building in Haifa, Israel. Intel's Design Center in Haifa was designed to conform to the Leadership in Energy and Environmental Design Green Building Rating System, a voluntary standard for developing high-performance, sustainable buildings.

**ANSWER:** Intel admits the allegations in Paragraph 48.

49.    Then, in 2017, Israel became home to Intel's Autonomous Driving Group, after the company acquired Mobileye, an Israel-based company that specialized in autonomous driving technology.

**ANSWER:** Intel admits the allegations in Paragraph 49.

50.    Two years later, in 2019, Intel unveiled an 800,000 square-foot, 11-story development center in Petah Tikvah, Israel called PTK1. Intel's leaders labeled PTK1 "the smartest building in the world."

**ANSWER:** Intel admits the allegations in Paragraph 50.

51.    Intel's investments in Israel - and vice versa - did not end there. In 2021, Intel began building a new manufacturing center in Kiryat Gat, Israel at an estimated cost of $10 billion. At the time, Gelsinger said that Intel's continued investments in the country "promise a vibrant future for Intel and Israel for decades to come."

**ANSWER:** Intel admits that it began building a new manufacturing center in Kiryat Gat, Israel in 2021, at an estimated cost of $10 billion. Intel admits that Paragraph 51 purports to quote a statement by Gelsinger, which, if it exists, is a written document that speaks for itself.

52.    Without a shadow of a doubt, Intel's investments in Israel have paid off handsomely for Intel. Indeed, in 2022, Intel Israel was responsible for $8.7 billion in exports and

its operations accounted for 5.5% of Israel's high-tech exports and 1.75% of the country's gross domestic product.

**ANSWER:** Intel admits that, in 2022, Intel Israel had $8.7 billion in exports and that its operations accounted for 5.5% of Israel's high-tech exports and 1.75% of the country's gross domestic product, and further avers that these figures do not reflect Intel's current financial status. Intel denies the remaining allegations in Paragraph 52 of the Complaint.

53.     In 2023, the aforementioned $10 billion manufacturing center in Kiryat Gat, Israel began operating. That same year, Intel announced its largest investment in Israel to date - a $25 billion factory in Kiryat Gat, Israel. Toward the historic effort, the Israeli government agreed to provide Intel with a $3.2 billion grant.

**ANSWER:** Intel admits the allegations in Paragraph 53.

54.     Presently, Intel's long-standing relationship with Israel is more cemented than ever - this year, 2024, marking half a century since Intel Israel was founded. Intel's investments in Israel cannot be understated.

**ANSWER:** Intel admits that Intel Israel has been in operation for fifty years, and that Intel strives to maintain a strong relationship with Israel.  Intel denies the remaining allegations in Paragraph 54.

55.     As of 2024, Intel has more than 10,000 employees that make up the powerhouse that is Intel Israel. To this point, to date, Intel has invested more than $50 billion into its operations in Israel, a figure - given Intel and Israel's rich history - that is sure to grow.

**ANSWER:** Intel admits that Intel Israel employs over 10,000 employees and that Intel has invested over $50 billion into its operations in Israel. Intel denies the remaining allegations in Paragraph 55.

56.     More than investing in its economy, Intel has also invested in Israeli communities. Indeed, Intel engineers teach over 30 courses at Israeli universities.

**ANSWER:** Intel admits that it has invested in Israel's economy and communities and that Intel engineers teach 35 courses at Israeli universities.

57.     Intel's relationship with Israel goes far beyond that of a common, arms-length partnership. Indeed, Intel's foundation, and much of its early success, was built off the backs of Grove and Frohman, two Jewish engineers. Indeed, because of the ingenuity of Jewish engineers, Intel was able to become the juggernaut that it is.

**ANSWER:** Intel admits that Grove and Frohman were engineers that worked for Intel and contributed to its early success. Upon information and belief, Intel admits that Grove was and Frohman is Jewish.  Intel denies the remaining allegations in Paragraph 57.

58.     Intel was the company that had succeeded on the back of Jewish and Israeli employees, from two Jewish immigrants to over 10,000 employees today, as well as because of the significant investments that Israel has made in Intel.

**ANSWER:** Intel admits that it employs over 10,000 employees at Intel Israel and that many of its employees, including Israeli and Jewish employees, have made meaningful contributions to Intel's success. Intel denies the remaining allegations in Paragraph 58.

## II.    <u>JOHN DOE'S BACKGROUND</u>

59.     John Doe is a Jewish Israeli citizen who proudly served with the Israel Defense Forces ("IDF"). His parents and siblings continue to live in Israel.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, therefore, denies those allegations.

60.     John Doe graduated from a highly selective and competitive school in the IDF and received an honors degree.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, therefore, denies those allegations.

61.    After attending the IDF school, John Doe worked in cybersecurity for the IDF.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, therefore, denies those allegations.

62.    Then, after concluding his army service, John Doe began working at an international technology company where he was responsible for leading the design and development of enterprise solutions for major banks.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and, therefore, denies those allegations.

63.    John Doe then became an employee of an Israeli data storage company where he managed all pre-sales and sales activities; developed and finalized technical solutions in collaboration with the engineering team; and provided strategic advice on IT infrastructure, cloud solutions and security.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, therefore, denies those allegations.

64.    Thereafter, John Doe was recruited to become an Engineering Leader by an Israeli Startup that improved processor engines.

**ANSWER:** Intel admits that, prior to working for Intel, Plaintiff worked for the Acquired Company. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64 and, therefore, denies those allegations.

65.    John Doe's contributions helped develop the Startup into a company with a large customer base and more than $8 million in Annual Recurring Revenue ("ARR") - an incredible success story for what started as a small startup.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and, therefore, denies those allegations.

66.    As a result of his significant achievments at the Startup, John Doe was asked to relocate to New York City on an L-1 visa to establish and build the Startup's U.S. market presence. It was a formidable task, but one that John Doe was excited to take on.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and, therefore, denies those allegations. The allegations in the footnote associated with Paragraph 66 purport to quote the USCIS website, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 66 and associated footnote.

## III.    INTEL ACQUIRES THE STARTUP AND JOHN DOE CONTINUES TO BE A <u>TOP PERFORMER</u>

67.    Just one month after John Doe moved to the United States to establish the Startup's U.S. market presence, Intel acquired the Company.

**ANSWER:** Intel admits that it acquired the Acquired Company in May 2022. Intel lacks knowledge or information sufficeint to form a belief as to the truth of the remaining allegations in Paragraph 67 and, therefore, denies those allegations.

68.    At the time of the acquisition, John Doe was named as one of the top ten key performers. As a result, Intel awarded him a significant retention bonus to be paid out over a four-year period in recognition of the importance of his work and to convince him to stay with Intel after the acquisition.

**ANSWER:** Intel admits that it awarded Plaintiff a retention bonus to be paid out over a four-year period and subject to other terms and conditions. Intel denies the remaining allegations in Paragraph 68.

69.     John Doe agreed to the retention bonus and began working for Intel as an Engineering Lead.

**ANSWER:** Intel admits that Plaintiff agreed to the retention bonus. Intel denies the remaining allegations in Paragraph 69.

70.     At that time, the Startup was integrated into Intel's Data Center & Artificial Intelligence Group ("DCAI"). John Doe received a retention bonus letter stating that his work in DCAI counted toward his vesting.

**ANSWER:** Intel admits that, at the time of the acquisition, the Acquired Company was integrated into Intel's Data Center & Artificial Intelligence Group ("DCAI"). Intel admits that it provided Plaintiff with a retention bonus letter, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 70.

71.     The Startup was then moved to be part of the Software and Advanced Technology Group ("SATG"), and John Doe received an amended letter stating that his work in SATG counted toward the vesting of his retention bonus.

**ANSWER:** Intel admits that the Acquired Company was moved to be part of the Software and Advanced Technology Group ("SATG") in or around May 2023. Intel admits that it provided Plaintiff with an amended retention bonus letter, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 71.

72.     For the first year of his employment, everything ran smoothly. John Doe reported directly to the Startup's former Chief Operating Officer. The former Chief Operating Officer in turn, reported to the Startup's Former CEO.

**ANSWER:** Intel admits that, during his first year of employment with Intel, John Doe reported to the the former Chief Operating Officer of the Acquired Company (hereinafter, the "Acquired Company COO"), who reported to the Acquired Company's CEO.  Intel denies the remaining allegations in Paragraph 72.

73.     Shortly thereafter, Intel reorganized and the Startup's business functions were moved to the Sales and Marketing ("SMG") organization. Once again, John Doe received an amended letter stating that his work for SMG would count toward the vesting of his retention bonus.

**ANSWER:** Intel admits that, as part of a reorganization, certain of business functions of the Acquired Company were moved to the Sales and Marketing ("SMG") organization in or around June or July 2023. Intel admits that it provided Plaintiff with an amended retention bonus letter, which is a written document that speaks for itself. Intel denies any characterization contrary to the letter and denies the remaining allegations in Paragraph 73.

74.     As a result of the reorganization, John Doe began working under the Startup's former Chief Revenue Officer. His division was consistently named a top performer.

**ANSWER:** Intel admits that Plaintiff began working under the former Chief Revenue Officer of the Acquired Company (hereinafter, the "Acquired Company CRO") in or around June or July 2023. Intel denies the remaining allegations in Paragraph 74.

75.     John Doe continued to receive excellent performance reviews. For example, in recognition of his "exceeds expectations" performance rating in the Fall of 2023, he was elevated to a Band 86 level within the SMG organization.

**ANSWER:** Intel admits that Plaintiff was moved to a Grade 086 level within the SMG organization effective in or about January 1, 2024. Plaintiff's performance reviews are written documents that speak for themeslves; Intel denies any characterization contrary to the written performance reviews.  Intel denies the remaining allegations in Paragraph 75.

76.     Thereafter, John Doe was promoted to become the Vice President of Engineering. Simultaneous with his promotion, John Doe received a substantial compensation increase.

**ANSWER:** Intel admits that John Doe received a compensation increase in or about January 2024. Intel denies the remaining allegations in Paragraph 76.

## IV.    AFTER HAMAS'S OCTOBER 7, 2023 ATTACK ON ISRAEL, INTEL VICE PRESIDENT, ALAA BADR CELEBRATES THE DEATH OF ISRAELIS

77.     As the Vice President of Customer Success at Intel, Badr, an Egyptian Muslim, is in charge of a diverse team of employese from all nationalities, ethnicities, and faiths.

**ANSWER:** Intel admits that Badr is the Vice President of Customer Success at Intel and is in charge of a diverse team of employees. Upon information and belief, Intel admits that Badr is an Egyptian Muslim.

78.     Prior to [the] October 7, 2023 attack on Israel, Badr publicly portrayed himself as someone dedicated to bridging divides, bringing community together, and advocating for cross-cultural competence between Muslims and non-Muslims.

**ANSWER:** Intel avers that Paragraph 78 purports to characterize the *Forbes* and *Valley Record* articles Plaintiff references in Paragraphs 79 and 80, *infra*, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 78.

79.    Badr spoke publicly about the importance of supporting Muslims in the workplace by urging employers to show compassion towards Muslim employees when fellow Muslims around the world are targeted by tragic events and discriminatory pracctices. As Badr said, "all these events have a deep effect on your employee. Part of being an amazing leader is to face it, break it down and discuss it."

**ANSWER:** Paragraph 79 purports to characterize a *Forbes* article, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 79.

80.    He has also spoken prolifically at public events to dispel myths about Muslims and talk about the importance of taking care of your neighbors.

**ANSWER:** Paragraph 80 purports to characterize a *Valley Record* article, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 80.

81.    Given these public declarations of the importance of understanding others, Badr appeared on paper as the perfect manager for a diverse group of employees.

**ANSWER:** Intel admits that Badr manages a diverse group of employees. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 81 and, therefore, denies those allegations.

82.    On October 7, 2023, Hamas, a terrorist group, unleashed an assault of startling brutality and breadth upon Israel. As Israeli citizens were preparing for bed, Hamas gunmen attacked numerous Israeli communities and showed no mercy. Indeed, Hamas gunmen murdered children, women, the elderly and anyone else they saw, without pause or remorse. No one was safe and women were indiscriminately and openly raped. The torture of Israeli citizens was publicly celebrated. The modern world had never witnessed an attack of that caliber in live time. If they

were not murdered, hundreds of Israeli citizens were taken captive. Even to the present day, numerous Israeli citizens, if they remain living, are still captive to Hamas.

**ANSWER:** Intel admits that terrorist group Hamas attacked Israel on October 7, 2023. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 82 and, therefore, denies those allegations.

83.    Israel responded in a steadfast pursuit to eradicate the terrorist group that caused such indiscriminate torture.

**ANSWER:** Intel admits that Israel responded to the Hamas attack. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83 and, therefore, denies those allegations.

84.    For its part, Intel purported to stand with Israel. In November 2023, Intel provided its Israeli employees a $5,000 wartime grant. In December 2023, Gelsinger stated: "For almost 50 years, we were the first company to start the tech nation there. I was just on the phone, yesterday, with Isaac Herzog, the president of the country. This is a resilient people. We will support them. We believe so deeply in what they've done." As it would turn out, this was mere lip service.

**ANSWER:** Intel admits that it provided its Israeli employees a $5,000 wartime grant. Intel avers that Paragraph 84 purports to quote a portion of a December 23, 2023 televised interview with Gelsinger, which speaks for itself. Intel denies the remaining allegations in Paragraph 84.

85.    For his part, Badr did not even bother with lip service and, shortly after the October 7, 2023 invasion, Badr's carefully crafted persona quickly fell apart because he was unable to hide his disturbing and hate-filled beliefs about Israelis.

**ANSWER:** Intel denies the allegations in Paragraph 85.

86.     Indeed, while publicly preaching peace and the importance of understanding differences in both life and in the workplace, Badr began openly showing his support for the terrorist organization Hamas and the destruction of Israel. To be clear, Badr did not simply sympathize with the plight of innocent Gazans stuck in the middle of Hamas and Israel. Rather, he openly advocated for and celebrated the murder of Israelis like John Doe and the members of his family.

**ANSWER:** Intel denies the allegations in Paragraph 86.

87.     In early December 2023, Badr liked a tweet celebrating the death of IDF soldiers. This entire tweet says the following: "At dawn today, the Qassam fighters were able to monitor the positioning of dozens of occupation soldiers (60 soldiers) inside tents at their positioning point east of Juhr al-Deek...[s]o the fighters planted 3 anti-personnel bombs in a circular pattern around the position, and at exactly 4:30 the bombs were detonated among the occupation soldiers. One of the fighters advanced to finish off the remaining members of the force, and the fighters withdrew to their positions safely **after killing a large number of occupation soldiers"** (emphasis added).

**ANSWER:** Paragraph 87 purports to characterize an X post, which is a written document that speaks for itself. The footnote associated with Paragraph 87 purports to characterize and quote news articles, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 87 and associated footnote.

88.     At the end of December 2023, presumably in response to 15 IDF soldiers being killed on December 23-24 in Gaza, Badr again liked several tweets praising the Hamas Qassam Brigade – the military arm of Hamas – for killing or harming Israeli soldiers.

**ANSWER:** Paragraph 88 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 88.

89.    For example, Badr liked a graphic image showing the foot of a Hamas soldier on the neck of an Israeli soldier with his/her face shoved into sand/dirt, an image of an Israeli soldier being strangeld by hands with word "Gaza" inscribed on them and an image of IDF soldiers being surrounded by tanks with a machine gun being pointed at them. To be clear, these images alone plainly show that Badr – an Intel Vice President who worked with Israeli and Jews – openly and proudly supported a terrorist organization and called for the death of Israelis.

**ANSWER:** Paragraph 89 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 89.

90.    On December 29, 2023, after a series of rocket attacks across northern Israel, Badr liked a tweet praising "what is being done to the Zionists," which meant, of course, attempts to kill or the actual killing of Israelis.

**ANSWER:** Paragraph 90 purports to characterize an X post, which is a written document that speaks for itself. The footnote associated with Paragraph 90 purports to characterize and quote a *Daily Mail* article, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 90 and associated footnote.

91.    However, not content to simply support hateful rhetoric about the death of Israeli soldiers, Badr also publicly liked tweets and images that went so far as to *celebrate the bombing and burning* of IDF soldiers, while also claiming they would be "sent to hell."

**ANSWER:** Paragraph 91 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 91.

92.    It is hard to imagine the depth of hatred Badr holds for Israelis when he made the decision to like callous tweets celebrating the burning of Israeli soldiers that ended with stomach-churning burn emojis.

**ANSWER:** Paragraph 92 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 92.

93.    Badr's hateful social media presence continued well into January 2024 when he liked tweets presumably celebrating Hamas' January 22, 2024 military attacks on Israelis, which was referred to then as the deadliest day for the IDF after 24 IDF soldiers were killed.

**ANSWER:** Paragraph 93 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 93.

94.    In addition to his hatred for Israel, Badr also displayed a growing anti-American sentiment as a result of the U.S. government's support of Israel. In one image, Badr liked a tweet claiming that President Biden supported and paid for Israel bombing hospitals. In another image that Badr liked, the Arabic roughly translates to: "the American people are waking from their coma; the American people understand" and chastises America's "moral decadence."

**ANSWER:** Paragraph 94 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 94.

95.    In a tweet and sentiment widely shared in anti-Israel media, there were several reports that released Israeli hostages later praised their treatment by Hamas while held in captivity. Despite the honors of captivity being widely discussed by multiple released hostages, Badr liked a tweet that said "Israeli prisoners love[d] the Hamas fighters who imprisoned them," quoting an even more offensive tweet that claimed the released hostage had the "smile of a lover, not the smile of fearful shame."

**ANSWER:** Paragraph 95 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 95 and associated footnote.

96.     While the underlying facts are true – Israeli prisoner Yocheved Lifshitz, an 85-year-old peace activist – did shake the hand of one of her captors, she also publicly stated that she "went through hell" once she was in the safety of a Tel Aviv hospital.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and, therefore, denies those allegations.

97.     To say or support the notion that any prisoner "loved" his/her captor is not only deeply offensive to the victims but simply untrue. Badr's support of such a narrative speaks only to his inability to recognize the trauma Lifshitz suffered after being taken captive and further displays Badr's dehumanization of Israelis.

**ANSWER:** Paragraph 97 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 97.

98.     During the same time Badr was publicly spreading this misinformation, tragedy struck John Doe's family in Israel when he nearly lost his entire family to a missile strike by Hamas. Indeed, John Doe's family home was struck by a Hamas missile with his family still inside. John Doe's immediate family members were all injured in the attack and they had to evacuate their home.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and, therefore, denies those allegations.

99.     Intel was well aware that John Doe's family was victimized by the rocket attack, as John Doe immediately told a Human Resources personnel for the Startup who was now working at Intel, in addition to several other co-workers.

**ANSWER:** Intel denies that it was aware at the time that John Doe's family was victimized by a rocket attack.  Intel lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 99 and, therefore, denies those allegations.

100.    The dichotomy of John Doe's family being attacked and injured in Israel while Badr publicly liked tweets celebrating the deaths of Israelis is shameful. The fact that Badr was allowed to continue working at Intel while spreading such hateful rhetoric calling for the death of Israelis is deeply disturbing.

**ANSWER:** Paragraph 100 purports to characterize X posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 100.

## V.    BADR BECOMES JOHN DOE'S DIRECT SUPERVISOR DESPITE PUBLICLY CELEBRATING THE DEATH OF ISRAELIS

101.    Whispers about Badr's support for the death and destruction of Israel and its people began spreading amongst a group of Intel employees in the Fall of 2023.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and, therefore, denies those allegations.

102.    When those rumors first surfaced, John Doe did not work with Badr but was deeply concerned about the Israeli and Jewish employees who had to work alongside him.

**ANSWER:** Intel admits that John Doe did not report to Badr in the Fall of 2023. Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported concern and therefore denies those allegations.

103.    As if Intel's blind eye to Badr's true nature was not disturbing enough, on January 29, 2024 John Doe was suddenly notified that Badr had become his new direct manager. John Doe would be the only Israeli reporting directly to Badr.

**ANSWER:** Intel admits that it notified Plaintiff he would begin reporting to Badr in or around late January or early February 2024. Upon information and belief, Intel further admits that Plaintiff was the only Israeli reporting directly to Badr at that time.

104.    John Doe was deeply distraught at the thought of reporting to a man who openly supported the murder of Israelis and Jews. While he would have been upset regardless of whether his family remained in Israel, it is hard to emphasize enough the true despair John Doe felt knowing he was expected to report to a man who was celebrating the murders of Israelis - like his family members - at the hands of Hamas.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported feelings in Paragraph 104 and, therefore, denies those allegations.

105.    John Doe immediately communicated with the Former CEO of the Startup to express his distress about reporting to Badr. He told the Former CEO that given Badr's opinions about Israelis and the IDF specifically, he knew Badr would fire him as soon as he could.

**ANSWER:** Upon information and belief, Intel admits that Plaintiff raised concerns regarding certain X posts Badr "liked" with the Acquired Company's CEO. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 and, therefore, denies those allegations.

106.    The Former CEO agreed to file an official complaint on behalf of John Doe and the other employees who would be within Badr's new reporting structure.

**ANSWER:** Intel admits that the Acquired Company CEO submitted an anonymous complaint related to certain X posts Badr "liked," which is a written document that speaks for itself.  Intel denies the remaining allegations in Paragraph 106.

107.    After John Doe asked an employee in Intel's Human Resources department to file an official complaint against Badr. The employee was hesitant to do so, likely based on her own fears of retaliation. As such, the Former CEO filed the complaint himself. In the complaint, the

Former CEO included a compilation of screenshots that showed Badr supporting Hamas and the murder of Israelis and Jews. He specifically stated that he was "report[ing] a concern with regards to an employee being hostile towards Israel and Israelis."

**ANSWER:** Intel admits that the Acquired Company CEO submitted the complaint anonymously through Intel's EthicsPoint on February 4, 2024. Paragraph 107 purports to characterize the EthicsPoint complaint, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 107.

108.    The Former CEO, while not naming John Doe directly, said that Badr had an Israeli employee assigned to him (John Doe was the only Israeli reporting to Badr) and reiterated that it would be "immoral and harmful to let [Badr] lead Israelis."

**ANSWER:** Paragraph 108 purports to characterize the EthicsPoint complaint, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 108.

109.    In the complaint, the Former CEO also asked that Jarrar, the Vice President of Business Sales and Badr's manager, be notified about the complaint.

**ANSWER:** Paragraph 109 purports to characterize the EthicsPoint complaint, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 109.

110.    Despite the very serious nature of the complaint, Intel did not respond, and John Doe continued reporting to Badr.

**ANSWER:** Intel admits that Plaintiff started to reported to Badr on February 9, 2024. Intel denies the remaining allegations in Paragraph 110.

**VI.    BADR CONTINUES HIS UNABATED ONSLAUGHT OF DISCRIMINATORY**

**CONDUCT**

111.    John Doe quickly realized that Badr's hostility and hatred toward Isarelis was not just confined to his online behavior, and that the carefully crafted image Badr had developed was fully fabricated.

**ANSWER:** Intel denies the allegations in Paragraph 111.

112.    Despite the great personal cost, John Doe showed up to work at Intel every day and put his best foot forward. Badr, however, was dead set on making John Doe's professional life as intolerable as possible because of his Jewish and Israeli heritage.

**ANSWER:** Intel denies the allegations in Paragraph 112.

113.    John Doe maintained the utmost professional decorum, but Badr's attitude toward him was frigid and isolating. It was as if Badr loathed the concept of even speaking to John Doe, so he simply did not. Indeed, despite being John Doe's direct manager, Badr almost never communicated with him.

**ANSWER:** Intel denies the allegations in Paragraph 113.

114.    When he did communicate with John Doe, Badr pressured John Doe to tell him whether other Intel employees were Israeli and when John Doe confirmed that specific employees were Israeli, Badr sneered that there were "so many Israeli employees in our company." It was as if Badr wanted to know exactly who he should despise based on their nationality.

**ANSWER:** Intel denies the allegations in Paragraph 114.

115.    Badr, despite being a high-level employee, would resort to school-yard bully tactics when it came to managing John Doe. For instance, Badr would refuse to approve the totally valid expense reports of John Doe's direct reports in an effort to assert dominance over the group, and John Doe in particular.

**ANSWER:** Intel denies the allegations in Paragraph 115.

116.    Badr would also regularly interrupt and undermine John Doe during team meetings. It was obvious that Badr wanted everyone at Intel to respect John Doe as little as he did, going out of his way to ensure that John Doe got very little time to provide the team with updates on his projects.

**ANSWER:** Intel denies the allegations in Paragraph 116.

117.    Badr would even go so far as undermining John Doe to his direct reports. Indeed, Badr would, in contravention of Intel's customary chain of commands, directly engage with John Doe's direct reports on various tasks.

**ANSWER:** Intel denies the allegations in Paragraph 117.

118.    John Doe reported Badr's discriminatory conduct to the Former CEO who assured him that the situation was being dealt with and would be investigated by Diana Egusa ("Egusa").

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 and, therefore, denies those allegations.

119.    In February 2024, John Doe alerted the Former CEO that his family home had been made inhabitable by a Hamas missile and that his family had all been injured in the attack. John Doe also informed the Former CEO that, simultaneous with the attack on his family home, Badr had publicly liked tweets cheering for a successful attack in Israel. John Doe also provided the Former CEO with photos of his destroyed family home. The Former CEO assured John Doe that Egusa would be made aware of Badr's abhorrent conduct.

**ANSWER:** Upon information and belief, Intel admits that Plaintiff informed the Acquired Company CEO that his family's home in Israel had been struck by a missile and that his family members had been injured in the attack. Intel also admits that the Acquired Company CEO amended the EthicsPoint complaint on February 22, 2024, to submit two photographs Plaintiff

provided, which are documents that speak for themselves. Intel denies the remaining allegations in Paragraph 119.

120.    The Former CEO was finally interviewed by Egusa on February 22, 2024. Four days later, John Doe received a notification that Badr had viewed his LinkedIn profile, which clearly states that John Doe served in the IDF. This caused John Doe additional indescribable distress – he was already on the receiving end of Badr's ire and now, Badr confirmed that John Doe was exactly what he (Badr) publicly wished death upon, an IDF soldier.

**ANSWER:** Intel admits that Egusa interviewed the Acquired Company CEO on February 22, 2024. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 120 and, therefore, denies those allegations.

121.    Moreover, it was clear to John Doe that Badr was well aware that John Doe was the underlying cause of the Company's investigation. After all, John Doe was the only Israeli reporting directly to Badr and it was known at Intel that it was John Doe's family home that was hit in the Hamas missile strike which he shared with the Former CEO who was interviewed by Egusa mere days prior.

**ANSWER:** Intel denies the allegations in Paragraph 121.

122.    By March 2024, however, Badr disbanded his Twitter account that was painted with vitriol towards Israelis and IDF soldiers. This indicated to John Doe that it was possible Intel actually spoke to Badr about his complaint. John Doe could not know for sure, however, because Intel never bothered to interview John Doe in connection with the complaint despite assurances from the Former CEO that he would be interviewed by Egusa.

**ANSWER:** Intel admits that Plaintiff was not interviewed in connection with the complaint. Upon information and belief, Intel admits that Badr deactivated his account on X in or around

March 2024. Intel denies the remaining allegations in Paragraph 122.

123.    Ever the optimist despite his abhorrent treatment, John Doe sincerely hoped that Intel was finally taking his complaint seriously and that it would replace Badr as his manager so that he could work peacefully in an environment free from blatant discrimination.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiff purportedly hoped for and, therefore, denies those allegations. Intel denies any remaining allegations in Paragraph 123.

## VII.    INTEL TERMINATES JOHN DOE WEEKS AFTER BADR DISCOVERS THAT JOHN DOE IS AN IDF VETERAN

124.    On April 2, 2024, one month after Badr discovered that John Doe served in the IDF, John Doe was "laid-off."

**ANSWER:** Intel admits that Plaintiff was informed on April 2, 2024 that his position in SMG was eliminated as part of a reorganization and avers that Plaintiff was placed in a different role with Intel.  Intel denies the remaining allegations in Paragraph 124.

125.    John Doe was completely stunned by the news of his dismissal. He had been one of Intel's most diligent employees and, by all metrics, was wildly successful in his role. Yet, he found himself without a job. John Doe knew the real reason he was terminated which were the facts that he was an Israeli and made complaints (through the Former CEO) about Badr's unlawful discriminatory animus.

**ANSWER:** Intel lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported reaction to the elimination of his position and, therefore, denies those allegations. Intel denies the remaining allegations in Paragraph 125.

126.    John Doe reported his layoff to the Former CEO who was completely shocked to learn that John Doe had been let go. After all, John Doe was one of Intel's top employees. The

Former CEO immediately instructed John Doe to seek legal counsel and said that he (John Doe) had been the victim of discrimination and retaliation.

**RESPONSE:** Upon information and belief, Intel admits that Plaintiff reported to the Acquired Company CEO that his position was eliminated. Intel denies the remaining allegations in Paragraph 126.

127.    The same day that John Doe was dismissed, the Former CEO updated his complaint - filed on behalf of John Doe - and wrote, *inter alia*:

> In the beginning of February I filed a complaint against Alaa [B]adr based on data I was given by Israelis who were going to report to him. 22 screenshots of likes on X (formerly twitter) calling for the death and killing of Israelis and Israeli soldiers. These employees were actively, and some still are, in reserve duty and fighting in the Swords of Iron war. They were not confident that Alaa can be unbiased regarding his views, and felt it's a hostile work environment to be reporting to someone publicly calling for your death and the death of your family and loved ones.

> 2 months after the complaint has been filed, there was a CPM in SMG which very suspiciously in Alaa's team, included all of the Israeli rolling up to him. It might be said that he had no active part in the decision, and that at the last minute only one was impacted (following conversations between Markus and Abdul). But as Alaa was the one who was supposed to explain how valuable their work is/was and convey their impact to Abdul in order to avoid this decision in the first place, **it's very hard to believe the decision was completely unbiased**. Especially, as it was ultimately reversed, proving just how valuable the Israelis really are to the business.

> The same team that brought me the information in the first place, now told me they see what happened/almost happened as complete retaliation and a full on hostile work environment to continue to work with him, not to mention roll up to him. They feel like instead of defending them against someone publicly calling for their deaths, Intel forced them to work for him and ultimately entrusted their fate in him, causing them to almost lose their jobs, not based on merit but retaliation for the complaint and full on hatred.

**ANSWER:** Intel admits that the anonymous complaint was amended on April 2, 2024. The complaint and any amendments to it are written documents which speak for themselves. Intel denies any remaining allegations in Paragraph 92.

128.    The Former CEO also sent an email message to the investigator, Egusa, in connection with John Doe's dismissal:

**ANSWER:** The email message referenced in Paragraph 128 is a written document which speaks for itself. Intel denies any remaining allegations in Paragraph 128.

129.    Indeed, Egusa admits that Intel was aware of the Former CEO's complaint that John Doe had been unlawfully terminated. Nevertheless, Intel took no corrective action against Badr and continued to allow him to oversee Israeli employees and have their professional fates in his hands.

**ANSWER:** Intel admits that it received a complaint regarding the elimination of Plaintiff's position in SMG and that Badr continued in his role. Intel denies the remaining allegations in Paragraph 129.

130.    After John Doe's unlawful termination, the Former CEO asked his boss, Marcus Firler ("Firler"), to create a new position for John Doe in a different organization. He argued that not only did Intel make a huge mistake in terminating John Doe, but he was also their best employee.

**ANSWER:** Intel admits that Plaintiff's position in SMG was eliminated. Intel also admits that before Plaintiff's employment with Intel terminated, a different role was opened in its SATG organization, which was offered to Plaintiff in May 2024. Intel lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 130 and, therefore, denies those allegations.

131.    Clearly recognizing that his termination was unlawful, Intel then created a new job for John Doe. The position had never existed before it was suddenly created for John Doe.

**ANSWER:** Intel admits that a role was opened in its SATG organization which was offered to Plaintiff in May 2024. Intel denies the remaining allegations in Paragraph 131.

132.    On May 20, 2024, the Former CEO confirmed that John Doe could be placed in the newly created role, but that it would come with a significant pay cut. John Doe confirmed that despite the pay cut, his retention bonus would remain in place.

**ANSWER:** Intel admits that Plaintiff was placed in a new role effective May 20, 2024, and prior to the effective date, he was informed of the total compensation associated with that new role.  Intel denies the remaining allegations in Paragraph 132.

133.    Barely pretending that John Doe's layoff was legitimate, just weeks after he was laid off for "cost cutting measures" and forced to take a lower-paying position, Badr replaced him with a new employee, Ahmed, who shared the same anti-Israel sentiments as Badr.

**ANSWER:** Intel admits that Plaintiff's position was eliminated part of a reorganization that was based, in part, on cost cutting measures. Intel also admits that it hired Mohamed Ahmed ("Ahmed") in May 2024. Intel denies the remaining allegations in Paragraph 133.

134.    Like Badr, Ahmed had a fondness for sharing hateful and discriminatory tweets about Israelis. In late October 2023, Ahmed presumably posted his support for Hamas when he wrote that God supplies equipment to fight Israel.

**ANSWER:** Paragraph 134 purports to characterize a social media post, which is a written document that speaks for itself. Intel denies any remaining allegations in Paragraph 134.

135.    Ahmed was also fond of reposting social media posts to show his belief that Israel is a terrorist state, liking posts implying pro-Israel positions are lies and promoting boycotts of

companies for supporting Israel (which is particularly ironic given his employment at a company that quite literally was built on the backs of Jews and Israelis).

**ANSWER:** Paragraph 135 purports to characterize social media posts, which are written documents that speak for themselves. Intel denies any remaining allegations in Paragraph 135.

136.    In a further act of retaliation, on July 3, 2024, Human Resources suddenly informed John Doe that his retention bonus was being cancelled.

**ANSWER:** Intel admits that Plaintiff's retention bonus did not transfer when he transitioned into his new role in SATG May 2024. Intel denies the remaining allegations in Paragraph 136.

137.    Intel was clearly continuing to harass, demoralize and retaliate against John Doe in an effort to push him out of the company again.

**ANSWER:** Intel denies the allegations in Paragraph 137.

138.    John Doe objected, showing written approvals and promises from the Former CEO and pointed out that his amendment letter plainly states that his new job counts toward vesting.

**ANSWER:** Intel denies the allegations in Paragraph 138.

139.    Despite that evidence, Intel upheld its decision to strip away John Doe's retention bonus. John Doe — who had only ever given his all to Intel — was being punished for protesting discrimination.

**ANSWER:** Intel admits that Plaintiff's retention bonus did not transfer when he transitioned into his new role in May 2024. Intel denies the remaining allegations in Paragraph 139.

140.    Intel does nothing to protect its Israeli employees. John Doe, an Israeli IDF veteran, was made to report to a man that would celebrate the death of his community, the death

of his family, and, frankly, the death of John Doe. Day after day, John Doe was made to swallow his pride and hold his tongue while being openly denigrated, even when his boss celebrated a missile strike that nearly killed his family. John Doe did what he was supposed to do: he complained over and over but no one at Intel stepped in. Intel left John Doe's fate to a man that publicly condemned everything that he is. Even after Intel unlawfully terminated John Doe, it did not even grant him the courtesy of upholding its promise to honor his retention bonus.

**ANSWER:** Intel denies the allegations in Paragraph 140.

141.    Intel likes to tout its lucrative relationship with Israel and cash in on its investment, but make no mistake: Intel does not concern itself with the wellbeing of its Israeli employees.

**ANSWER:** Intel denies the allegations in Paragraph 141.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)

142.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

143.    Defendants discriminated against Plaintiff on basis of his race and ethnicity in violation of Section 1981 by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 143.

144.    Defendants discriminated against Plaintiff on the basis of his race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to

prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

**ANSWER:** Intel denies the allegations in Paragraph 144. Intel has a long-time culture of diversity and inclusion and does not tolerate hate speech, as outlined in its code of conduct.

145.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 145, and specifically denies that Plaintiff is entitled to any damages.

146.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

**ANSWER:** Intel denies the allegations in Paragraph 146, and specifically denies that Plaintiff is entitled to any damages.

147.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 147, and specifically denies that Plaintiff is entitled to any damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

148.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

149.    Defendants retaliated against Plaintiff by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 149.

150.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 150, and specifically denies that Plaintiff is entitled to any damages.

151.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 151, and specifically denies that Plaintiff is entitled to any damages.

152.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 152, and specifically denies that Plaintiff is entitled to any damages.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**

153.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

154.    Defendants discriminated against Plaintiff on the basis of his race, ethnicity, religion and national origin in violation of the NYSHRL by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 154.

155.    Defendants discriminated against Plaintiff on the basis of his race, ethnicity, religion and national origin in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

**ANSWER:** Intel denies the allegations in Paragraph 155.

156.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 156, and specifically denies that Plaintiff is entitled to any damages.

157.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental

anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

**ANSWER:** Intel denies the allegations in Paragraph 157, and specifically denies that Plaintiff is entitled to any damages.

158.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 158, and specifically denies that Plaintiff is entitled to any damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**

159.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

160.    Defendants retaliated against Plaintiff by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 160.

161.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 161, and specifically denies that Plaintiff is entitled to any damages.

162.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 162, and specifically denies that Plaintiff is entitled to any damages.

163.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 163, and specifically denies that Plaintiff is entitled to any damages.

### FIFTH CAUSE OF ACTION
**(Discrimination in Violation of the NYCHRL)**

164.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

165.    Defendants discriminated against Plaintiff on the basis of his race, ethnicity, religion and national origin in violation of the NYCHRL by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 165.

166.    Defendants discriminated against Plaintiff on the basis of his race, ethnicity, religion and national origin in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

**ANSWER:** Intel denies the allegations in Paragraph 166.

167.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages

**ANSWER:** Intel denies the allegations in Paragraph 167, and specifically denies that Plaintiff is entitled to any damages.

168.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

**ANSWER:** Intel denies the allegations in Paragraph 168, and specifically denies that Plaintiff is entitled to any damages.

169.    Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 169, and specifically denies that Plaintiff is entitled to any damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

170.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Intel repeats and realleges its responses to each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

171.    Defendants retaliated against Plaintiff by, *inter alia*, terminating his employment, revoking his retention bonus and substantially reducing his compensation, as well as by requiring him to report someone who would have celebrated his death and the death of his family members.

**ANSWER:** Intel denies the allegations in Paragraph 171.

172.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 172, and specifically denies that Plaintiff is entitled to any damages.

173.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of damages.

**ANSWER:** Intel denies the allegations in Paragraph 173, and specifically denies that Plaintiff is entitled to any damages.

174.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Intel denies the allegations in Paragraph 174, and specifically denies that Plaintiff is entitled to any damages.

## PRAYER FOR RELIEF

Intel denies each and every allegation in the Prayer for Relief, sub-paragraphs A-K, inclusive, and specifically denies that Plaintiff is entitled to recover any damages in this matter.

## JURY DEMAND

Intel admits that Plaintiff purports to demand a trial by jury and denies that Plaintiff is entitled to a jury trial on all or some issues in this action.

## GENERAL DENIAL

Intel denies all allegations in the Complaint not specifically admitted herein.

## SEPARATE DEFENSES

Intel asserts the following defenses without conceding that Intel bears the burden of proof as to any of the following defenses.

1.      The Complaint fails, in whole or in part, to state claims upon which relief may be granted to Plaintiff.

2.      The Complaint does not contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. Rather, the Complaint provides conclusory allegations and legal conclusions, which are insufficient.

3.      Plaintiff's Complaint fails to provide the grounds of his alleged entitlement to relief.

4.      Plaintiff's claims are not actionable because Intel's actions were justified by legitimate, non-discriminatory and non-pretextual business reasons, and were based on reasonable factors other than those proffered by Plaintiff.

51

5.      Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff has failed to satisfy all conditions precedent in order to bring his claims.

6.      To the extent that Plaintiff failed to comply with the statutory and/or jurisdictional prerequisites for the institution of an action under the statutes upon which he relies in the Complaint (including but not limited to any requirement to exhaust administrative remedies), if any, his claims are barred and/or diminished.

7.      Plaintiff's damages are limited by the applicable laws under which his claims are brought.

8.      Plaintiff, by his own actions, is responsible, in whole or in part, for any alleged damages in this case.

9.      Without conceding that Plaintiff has suffered any damages as a result of any alleged wrongdoing by Defendants, Plaintiff has failed and/or refused to mitigate or minimize the alleged damages.

10.     Plaintiff's claims are barred in whole or in part by the equitable doctrines of estoppel, waiver, unclean hands, and/or laches.

11.     Plaintiff's claims are barred in whole or in part by judicial estoppel.

12.     Intel does not have any liability or duty toward Plaintiff under the facts alleged in the Complaint.

13.     If Plaintiff proves that Intel acted in violation of any applicable statute, either by action or omission (which Intel denies), such action or omission was not willful or reckless, but rather was in good faith and based upon a reasonable belief that such action or omission was not a violation of any applicable statute.

14.     Neither Intel, nor any employees sufficiently high in its corporate hierarchy, committed any act with malice or reckless indifference to the protected rights of Plaintiff, or approved, authorized or ratified, or had actual knowledge, of any such acts.

15.     If any improper, illegal, or discriminatory act was taken by an employee of Intel against Plaintiff, it was outside the course and scope of that employee's relationship with Intel, contrary to Intel's policies, and was not ratified, confirmed, or approved by Intel. Thus, any such actions cannot be attributed or imputed to Intel.

16.     If Plaintiff can somehow establish a discriminatory or retaliatory motive that was a factor in any action taken by Intel against Plaintiff, Intel reserves the right to rely on the mixed-motive defense, if applicable.

17.     Plaintiff is not entitled to any relief, damages, liquidated damages, attorneys' fees, costs, or any monetary compensation whatsoever from Intel under any of the laws referenced in his Complaint or any other law, statute or regulation. Intel had no obligations under any of the laws referenced in his Complaint with respect to Plaintiff and/or complied with any and all obligations it may have had under any such laws.

18.     Intel has not engaged in any act or omission which may be the adequate cause of the damages requested by Plaintiff in this case.

19.     Intel is relieved of liability because other intervening and superseding causes of loss, injury, or damage alleged by Plaintiff, were the principal causes of Plaintiff's injuries and/or damages.

20.     Intel did not discriminate, harass or retaliate against Plaintiff because of his race, ethnicity, national origin, religion, or because of any other protected category or activity in any manner.

21.    Intel denies that any impermissible factor had any role in the employment decisions relating to Plaintiff.

22.    All actions or decisions by connection with the employment of Plaintiff were in good faith based upon just cause and legitimate, non-discriminatory/non-retaliatory business and other reasonable factors other than Plaintiff's race, ethnicity, national origin, religion, or any other protected category or activity and unrelated to any statutory rights or protection invoked by Plaintiff.

23.    Intel has in place a strong, well-distributed policy against discrimination, harassment and retaliation, and otherwise exercised reasonable care to prevent and promptly correct any such behavior.

24.    Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by Intel, or to avoid harm otherwise.

25.    The conduct alleged in Plaintiff's Complaint does not rise to an actionable level under the New York State Human Rights Law pursuant to N.Y. Exec. Law § 296(1)(h) and/or under the New York City Human Rights Law pursuant to *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 79-80, 872 N.Y.S.2d 27, 41 (1st Dep't 2009).

26.    Plaintiff's claims are frivolous, unreasonable, and groundless claims and, therefore, Plaintiff should be required to pay Intel's attorneys' fees and costs incurred in defending against such claims, based on, *inter alia*, the United States Supreme Court's decision in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978).

27.    Intel cannot be liable for punitive damages because Intel made a good-faith effort to comply with all applicable laws and, at all relevant times, have acted reasonably, in good faith

and without malice based upon all relevant information and facts and circumstances that Intel knew at the time it acted.

28.    An award of punitive damages under the circumstances of this case would constitute an excessive fine and otherwise would be in violation of Intel's due process and other rights under the United States Constitution.

29.    Plaintiff has suffered no economic loss and/or failed to mitigate his alleged damages, entitlement to which is specifically denied.

Intel reserves the right to add additional defenses as this case proceeds and/or based on information learned during further factual investigation and/or the discovery process.

WHEREFORE, Intel respectfully requests that this Court dismiss Plaintiff's case with prejudice, and enter judgment against Plaintiff.

Dated: October 14, 2024

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Melissa C. Rodriguez*

Melissa C. Rodriguez, Bar No. 4051751
melissa.rodriguez@morganlewis.com
Hanna E. Martin, Bar No. 5477690
hanna.martin@morganlewis.com
101 Park Avenue
New York, NY  10178-0060
+1.212.309.6000
+1.212.309.6001

Grace E. Speights, *Pro Hac Vice* Pending
grace.speights@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
+1.202.739.5189

*Attorneys for Defendant*
*Intel Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of October 2024, a true and correct copy of the foregoing document was filed electronically with CM/ECF system.

/s/ *Melissa C. Rodriguez*
Melissa C. Rodriguez
